**STATE of Missouri, Plaintiff-Respondent,**

v.

**John Kent GRAHAM, Defendant-Appellant.**

**No. 35445.**

Missouri Court of Appeals, St. Louis District, Division Two.

Sept. 9, 1975.

Wolff & Todt, Donald L. Wolff, Clayton, Alan G. Kimbrell, St. Louis, for defendant-appellant.

John C. Danforth, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, Gene McNary, Pros. Atty., George R. Westfall, Asst. Pros. Atty., Clayton, for plaintiff-respondent.

KELLY, Judge.

John Kent Graham appeals from a conviction of rape of a female child under the age of sixteen years in violation of § 559.-260 RSMo 1969, and a sentence to a term of two years in the custody of the Missouri Department of Corrections in accord with a jury verdict in the Circuit Court of St. Louis County. We affirm.

Appellant, hereinafter the defendant, while he does not directly challenge the sufficiency of the evidence in his Points Relied On portion of his brief in this court does so indirectly as we shall hereinafter more fully develop. The thrust of defendant's contentions on appeal is that during the course of the trial of this cause certain evidence came in which was so prejudicial that despite the fact the trial court sustained his objections and instructed the jury on two of the three occasions to disregard the evidence, the only way the prejudice engendered thereby could be removed so that defendant could enjoy the fair trial guaranteed to him by law was for the declaration of a mistrial as he requested, and discharge of the jury so that he could enjoy a trial before another jury freed of these prejudicial impacts.

The primary issue at trial was the identity of the rapist. On the one side was the victim, a 13 year old girl at the time of the offense, who identified the defendant as her attacker at a voice identification and visual confrontation in a show-up at the St. Louis County Police Headquarters some almost five months following the incident. She had also, on an occasion shortly after the attack selected from a group of photos one as a photo of her attacker and which was a photo of the defendant. A month or two after the attack she also recognized the defendant as her attacker on two occasions when he was visiting or passing-by a neighbor's home. At trial she identified the defendant as the rapist.

Defendant testified in his own behalf and denied that he was the culprit. He, together with four other defense witnesses, testified to alibi. The gist of their testimony was that defendant together with five of his friends—four of whom testified, and one of whom was defendant's brother—attended a drive-in theatre on the night of the attack—April 23, 1971—until midnight—an hour after the attack according to the victim's testimony.

While there were, understandably, some inconsistencies in both the state's and the defendant's evidence, the jury resolved the inconsistencies in the state's case and found the defendant guilty.

The evidence which defendant contends was so prejudicial as to entitle him to a mistrial in the trial court and a reversal and remand in this court consists of the following:

(1) testimony of a detective that while not under arrest three days following the rape—April 26, 1971—defendant initially agreed to accompany the police officers to the headquarters of the St. Louis County Police for a "voluntary line-up" but, after leaving his home he changed his mind

and was then arrested and conveyed to headquarters nonetheless;

(2) testimony of the victim that after the defendant was taken to police headquarters his father got him out on bail five minutes before she arrived there; and

(3) cross-examination of the defendant relative to his insistence that he have an attorney present at a subsequent line-up at police headquarters on September 10, 1971, at which time the victim identified him as her attacker.

Defendant also contends that the cumulative effect of the aforesaid prejudicial evidence deprived him of a fair trial.

The thrust of defendant's argument is that in each instance the state offered the evidence of which he complains for the purpose of chilling the constitutional rights guaranteed to him by both the federal and state constitutions and thereby caused the jurors to infer from the exercise of these constitutional rights a "consciousness of guilt."

The state, wisely we believe, does not undertake to defend the admissibility of this evidence, but rather responds that defendant has failed to preserve anything for this court to review by reason of the objection presented to the trial court at the time the evidence was adduced and also because the requirements of *State v. Brookshire,* 325 S.W.2d 497, 500[3] (Mo.1959) for the preservation of alleged constitutional error have not been satisfied. The state further argues that the errors alleged were cured by the action of the trial court in sustaining defendant's objections and instructing the jurors to disregard the testimony in the first two instances, and that in each instance a mistrial was not necessary. Defendant requests that this court consider the alleged errors under the "plain error" Rule—Rule 27.20(c)—but the state contends that we should not invoke the Rule because of the strength of the state's case and the

alleged errors did not result in manifest injustice or a miscarriage of justice.

In response to these arguments the defendant retorts that the victim's identification testimony is unreliable because of the lighting conditions at the time and place of the attack; that the state has failed to make any defense of the prosecutor's development of the evidence and therefore confesses its erroneous nature; and that the "consciousness of guilt" effect of the testimony is particularly harmful in a case where there is only one eyewitness upon whose testimony the state was required to depend to obtain a conviction, as was the case here.

Defense counsel on appeal is to be commended for the excellent presentation of his position both in the brief filed in this court and in oral argument. His task was made more burdensome by the failure to properly preserve in the trial court the constitutional issues he attempts to raise in this court for the first time in an effort to obtain for his client a new trial. These inadequacies shall be more fully pointed out as we consider the Points raised by counsel on appeal.

To better understand the contention of the state that there is a failure to properly preserve the errors alleged by the defendant it is essential that the manner in which trial counsel presented his objection to the trial court for a ruling be set out.

At the time the detective testified about the defendant's change of mind to voluntarily accompany the police officers to headquarters for a line-up on April 26, 1971, defense counsel's objection was that the evidence was inadmissible because he had, prior to trial, filed a motion to suppress and exclude any confessions or statements against the defendant's interest which the state had in its files, that the state had confessed this motion and advised him that it had no statements against interest. This evidence, defense counsel argued, was either a statement against interest or was a violation of the hearsay rule. The objection did not direct the trial court's attention to

any constitutional grounds. The trial court was requested to grant defendant a mistrial, or, in the alternative, to admonish the jury to disregard the statement. The trial court proceeded to deny the motion for mistrial, sustained that part of the objection requesting that the jury be instructed to disregard the statement and proceeded to instruct the jury to disregard that portion of the witness' testimony that stated that the defendant did or did not accompany the police voluntarily. This point was not raised in the motion for new trial filed by trial counsel nor in the supplemental motion for new trial filed by counsel on appeal. The first time any constitutional basis for this objection was put forward was in this court when defendant filed his brief.

The testimony of the victim with respect to defendant's release on bail prior to the time she could arrive at police headquarters was given in an unresponsive answer to a question propounded to her by the prosecuting attorney. The question was: when was the next time, after her initial visit to police headquarters in the early morning hours of April 24, 1971, she returned to police headquarters. She replied: "They had me there—I was supposed to look at a line-up and somehow he wasn't there when we got there. He had left like five minutes before we got there. His father got him out on bail or something." The objection of trial counsel was:

"I am going to ask that the jury be discharged and a mistrial declared because of this girl saying that he left before I could look at him; his father got him out on bail. This is not proper; none of this stuff he is doing is proper. He is not supposed to say what did you do next; what she does is not evidence against the defendant. This letting him go through—"

"THE COURT: She has no personal knowledge what happened."

Defense counsel thereupon requested that the testimony be stricken and the jury be admonished. The trial court then instructed the jury that they were to disregard any statement by the witness as to what may or may not have happened about any bail or release, or any such statement. The motion to strike and the motion for mistrial were not definitively ruled on and defendant's counsel did not insist that they be. Further, this point was not raised in either defendant's original motion for new trial nor the Supplemental Motion for New Trial thereafter filed. This point too appeared for the first time in defendant's brief filed in this court and then on the basis of a violation of defendant's right to bail.

The third basis for reversal espoused by defendant came about in the following manner during cross-examination of the defendant:

"Q. Were you arrested a second time in September on this charge?

A. Yes, I was.

Q. Do you remember how you got to the police station?

A. I think I gave myself up. I am not sure.

Q. And was there an attorney there at your request?

A. Yes.

Q. Who was that; do you recall?

A. Jerry Flanagan.

Q. From Mr. Shaw's office?

A. Yes.

Q. He was there for the line-up?

A. Yes, he was."

At this point in the cross-examination trial counsel approached the Bench and, out of the hearing of the jury, made a request for the discharge of the jury and the declaration of a mistrial because the prosecutor mentioned that a lawyer was present with the defendant, because the defendant had a right to have a lawyer present, and this could not be mentioned at trial unless the defendant himself waived it by mentioning it. Although offered an opportunity to expand upon his request for other curative action by the trial court, defense counsel

reiterated that his only request was for a mistrial—"no alternatives." The trial court then denied defendant's motion to discharge the jury and declare a mistrial. This latter ruling was preserved by trial counsel in his motion for new trial and has been briefed in this court as a violation or chilling of defendant's Sixth Amendment rights of the United States Constitution as made applicable to the several states by the Fourteenth Amendment thereof and by Article I, Section 18(a) of the Constitution of Missouri.

The granting of a mistrial is a remedy so drastic that it is reserved for only those cases where the error committed during the course of the trial is so grievous and prejudicial that its effect cannot be removed in any other way. *Kansas City v. LaRose*, 524 S.W.2d 112, 120[19] (Mo. banc 1975). For that reason the granting of a mistrial rests largely in the discretion of the trial court who observed the incident giving rise to the request and who can better gauge its effect upon the jury. *State v. Pruitt*, 479 S.W.2d 785, 790[11] (Mo. banc 1972). An appellate court is reluctant to disturb the ruling of the trial court denying a motion for mistrial except where the trial court has abused its discretion. *State v. Seals*, 515 S.W.2d 481, 486 (Mo.1974). The rule of the appellate courts of this state is that constitutional questions must be raised in the trial court at the earliest opportunity consistent with orderly procedure; they may not be raised for the first time in the appellate court. The defendant in a criminal case, if he proposes to raise a question pertaining to the violation of a constitutional right, must object to the introduction of evidence which he construes to be in violation of that right, and clearly and specifically state the constitutional grounds for the objection; otherwise, the introduction of the evidence in violation of his rights will not be sufficient basis for an assignment of error in his motion for new trial. His motion for new trial must also present and direct the trial court's attention to the defendant's trial objections by clearly stating with particularity his constitutional grounds. In short, defendant must preserve constitutional error from the earliest fair opportunity and he must continue to do so throughout the case both in the trial court and in the appellate court. *State v. Meiers*, 412 S.W.2d 478, 481[2, 3, 4] (Mo. 1967).

It was only with respect to the third incident—i. e., cross-examination of the defendant about the presence of his lawyer at the line-up of September 10, 1971 —that the objection interposed approached what might be considered as raising constitutional grounds. Assuming arguendo that it does, the objection was not timely made, coming after the answer was already in, and the relief requested was for a mistrial alone. The general rule in this state is that the objection must be made before the answer is given to preserve anything for review, except in those instances where the answer is given before the trial counsel can determine its prejudicial nature or is caught by surprise. Even in either of these latter two situations, counsel is required to request that the answer be stricken to preserve the error for review. *State v. Taylor*, 408 S.W.2d 8, 11[8] (Mo.1966); *State v. Velanti*, 331 S.W.2d 542, 547[7] (Mo.1960).

There are, however, other reasons why this evidence did not constitute error. The requirements of the presence of counsel at line-ups or a knowledgeable and voluntary waiver of counsel's presence at a line-up enunciated in *United States v. Wade*, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) applies only to a line-up held after a charge has been filed against the defendant. *State v. Hamilton*, 490 S.W.2d 96, 97[1] (Mo.1973). Defendant in this case was not indicted until October 27, 1971, and there is no evidence that he was at the time of the September 10, 1971, line-up charged with this or any other offense. To dispose of this claim of error we do not have to decide whether that time between defendant's arrest on April 26, 1971, and his release on bail and his appearance at the September 10, 1971, line-up

constitutes a critical stage of the criminal prosecution as that phrase was used in Wade, which would entitle him to the presence of counsel. Regardless, he had counsel there.

Prior to trial, on June 19, 1972, defendant filed a motion to suppress the voice identification and line-up identification of September 10, 1971. The grounds for this motion were stated in non-specific terms as violations of defendant's rights guaranteed to him under Article I, Section 18(a) of the Constitution of the State of Missouri and the Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution. At the same time a "Memorandum by Agreement" was filed with the trial court signed by the prosecutor and defense counsel whereby it was agreed between the parties that the motion would be passed to be heard at the time of trial. By agreeing to so proceed on the motion and by failing to request a hearing on this motion out of the presence of the jury, defendant's counsel consented to the trial court's receiving evidence on the issues raised by the motion during the course of the trial and in the jury's presence. The inherent dangers of this method of procedure, where the fairness of the conduct of a line-up is in issue, should be apparent to counsel if he seriously challenges the validity of the extra-judicial identification procedures for the purpose of eliminating any identification during the course of the trial on the grounds that the identification testimony has been tainted by the pre-trial confrontation and is not, therefore, admissible at trial. The fact of the presence of counsel for the defendant is some evidence for the trial court, who must initially decide the issues on this motion, to consider. The prosecuting attorney might well have pursued this line of inquiry to refute any contentions by the defendant that the conduct of the line-up was such as to taint the victim's in-court identification, by reason of the presence of defendant's counsel at the line-up.

Furthermore, during the course of the trial defendant's counsel delved into the conduct of the September 10, 1971, line-up during his cross-examination of the victim on the composition of the line-up, the manner of defendant's dress during the time he was before her in the line-up, the lighting conditions in the show-up room, the length of the defendant's hair while he was in the line-up and whether the defendant was the only one in the line-up with long hair or with hair as long as that of her attacker, whether all of the persons in the line-up were of approximately the same height, whether all had mustaches, and whether they were all dressed in shirts and trousers. In the context of the foregoing, the cross-examination of defendant concerning whether he had counsel present at the line-up would be relevant on the issue of fairness.

Earlier in the trial and during the testimony of Detective Gilyon, the prosecutor inquired who was present at the line-up of September 10, 1971, and the witness was permitted without objection to reply: "I believe Detective Consolino from Identification Bureau, my partner, Detective Boyd, the defendant, three other County detectives, Gene Fahrenkrog from the Prosecuting Attorney's Office, and a representative of Mr. Shaw's Office." This query was followed by: "An attorney?" and drew the response, "Yes, sir."

It was made apparent to the jury early in the case during cross-examination of the prosecuting witness that Mr. Flanagan was an associate of Mr. Shaw, the trial counsel, because of references made to Mr. Flanagan as the defendant's counsel at the taking of the deposition used for the purposes of attempting to impeach the testimony of the prosecuting witness at trial. Later, during the redirect examination of the defendant by his trial counsel it was again brought out that the defendant volunteered to go to the line-up of September 10, 1971, and that he was at that time accompanied by Mr. Flanagan. It would be speculative to conclude that the jury from this evidence would conclude other than that Mr. Flanagan was

present at the line-up at the defendant's request; no other reason for his being there was shown.

If, as defendant contends, this evidence tended to create in the minds of the jurors that the presence of a lawyer representing him at the September 10, 1971, line-up was introduced into the case for the purpose of demonstrating by the exercise of a constitutionally guaranteed right to counsel he evidenced a "consciousness of guilt" we conclude that defendant's trial counsel himself contributed to the drawing of such conclusion by agreeing to permit the motion to suppress to be taken with the case and by his own line of interrogation, and cannot, now, convict the trial court of error in this regard.

Defendant's remaining Points were not preserved for review in this court because of the failure of trial counsel to incorporate them into his motion for new trial. Nor did the Supplemental Motion for New Trial filed within the time granted by the trial court—40 days—for the purpose of filing a motion for new trial pursuant to Rule 27.20(a) point out to the trial court these alleged trial errors. If we are to consider them we must do so pursuant to the provisions of Rule 27.20(c) as "Plain errors affecting substantial rights . . . when the court deems that manifest injustice or miscarriage of justice has resulted therefrom."

Counsel on appeal, being cognizant that his remaining Points were not preserved for review, presents them on the basis of constitutional error, apparently in the hope that we will consider them despite the procedural infirmities with which he has been harnessed.

However, the standard against which to measure the decision to afford the defendant the review he seeks on the basis of Rule 27.20(c), even where constitutional errors are alleged, is whether there is a sound, substantial and clear showing that manifest injustice or miscarriage of justice will result if the rule is not invoked. The mere allegation of constitutional error, even if proven, does not automatically satisfy this standard. *State v. Harms,* 507 S.W.2d 29, 31[3] (Mo.App.1974); *State v. Murphy,* 521 S.W.2d 22, 25[3] (Mo.App.1975). The allegations of manifest injustice or miscarriage of justice must be supported by some kind of factual showing.

The primary weakness in defendant's position is that in each of the two instances of evidentiary error remaining, his objection was sustained and the jury was instructed to disregard the testimony. The only relief requested which he did not obtain was a mistrial. What he forcefully contends here is that this evidence was so prejudicial that the only effective relief available to him was mistrial. The experienced trial judge observed the circumstances surrounding the advent of the testimony into the proceedings and determined that the appropriate relief to be granted at that time was to sustain the objection and instruct the jury to disregard it. He was in a better position to assess what prejudice, if any, defendant sustained as a result of these statements and what remedy was appropriate to cure it.

The trial jury was on two separate occasions instructed to disregard these statements: first, at the time the objection was made and, secondly, when the trial court instructed the jury prior to submission in Instruction No. 6. Thus, in effect, the evidence was stricken from the record and the jury was so advised. *Welch v. Sheley,* 443 S.W.2d 110, 117[4] (Mo.1969). Courts, both trial and appellate, operate on the assumption that jurors follow the instructions given to them either orally or in writing and we are shown no reason why we should deviate from that assumption in this case.

Defendant devotes a greater part of his brief to an in-depth citation of cases to support his contention that the state may not introduce evidence that a defendant exercised a constitutional right or privilege and thereby allow the jury to infer from

the exercise of said right or privilege a consciousness of guilt.

The cases cited by defendant in support of these contentions are opinions where the question before the court was the admissibility of the prejudicial evidence and its effect when it was left in the case, and most of the others can be distinguished because they involve the refusal to submit to a search, or to a lie detector or blood alcohol test and where the prosecuting attorney, during the course of the trial or in summation, made frequent reference to the inadmissible evidence. *Bargas v. State,* 489 P.2d 130, 133[5] (Alaska, 1971); *State v. Kolander,* 236 Minn. 209, 52 N.W.2d 458, 465-6[7] (1952), and *People v. Stratton,* 1 N.Y.2d 664, 150 N.Y.S.2d 29, 133 N.E.2d 516 (1956). Other cases cited by the defendant holding that where evidence of a defendant's exercise of his constitutional rights called for reversal despite the failure of the defendant to object to the evidence, may be distinguished from the present case because in those situations the jury had not been instructed to disregard the evidence and it was logical to assume that in arriving at their verdict they did consider the prejudicial evidence along with the rest of the evidence in the case to the prejudice of the defendant. Thus, the only remedy available in those cases to remove prejudice was by reversal and remand in the appellate court.

Here the trial court took prompt action after the evidence came in prior to any objection. The evidence was not repeated nor emphasized at any other time during trial and the trial judge concluded that his instruction had removed any prejudice which might have resulted.

The decisive issue in this case is not whether it was error to introduce into the trial of the case evidence of those instances of which defendant complains, but rather whether the defendant is entitled to a new trial because the action taken by the trial court was not effective in curing the error and resulted in defendant being deprived of the fair trial he is entitled to under both federal and state constitutions.

Defendant at no time argues that these references are direct references to the defendant's guilt of the crime for which he was on trial. It is his contention that from this evidence the jury "might infer" a consciousness of guilt. The Supreme Court of this state has held that in those cases where reference is made to the failure of a defendant in a criminal case to testify in the exercise of both constitutionally guaranteed rights and statutorily imposed restrictions it is only a *direct and certain reference* to his exercise of this right that is condemned. *State v. Hutchinson,* 458 S.W.2d 553, 555[3] (Mo. banc 1970).

Having concluded that defendant was not prejudiced by the testimony he raised as error in this court because of the court's timely action on each separate occasion, we also conclude that their combined effect does not require that we reverse and remand this case for a new trial on those grounds.

Defendant also contends that he is the victim of a manifest injustice or miscarriage of justice and for that reason we should reverse the judgment of the trial court and remand the cause for a new trial. The bases for this contention is many-faceted, including arguments directed to evidence developed during the trial as well as post-trial evidence offered in support of defendant's Supplemental Motion for New Trial on the grounds of newly discovered evidence.

The thrust of defendant's arguments with reference to those matters which occurred during the course of the trial resulting in manifest injustice or miscarriage of justice are that the victim's identification, unsupported by any corroborative evidence, is insufficient to support the verdict of the jury particularly in view of defendant's alibi evidence. He cites in support of this argument the poor lighting conditions at the rape scene and the fact that it was four and a half months after the rape before the

victim confronted the defendant in a line-up. He argues that the testimony of a 13 year old girl identifying a boy she had never seen before is subject to extremely close scrutiny under the other circumstances mentioned above, and asks us to give cognizance to "The vagaries of eyewitness identification . . . ."

In further support of his position the defendant notes that in arriving at its verdict the jury evidenced doubt of the defendant's guilt despite the fact it ultimately rendered a guilty verdict. He refers to the fact that the jury spent a total of six hours in its deliberations. The cause was submitted to the jury at 7:20 p. m. and, on February 16, 1973, after it had deliberated for three hours and fifty minutes, the jury was returned to the courtroom and given the "hammer" instruction at 11:10 p. m. An hour later, 12:10 a. m., February 17th, the jury returned and announced that it had reached a verdict. This verdict found the defendant guilty as charged, assessed his punishment at two years and recommended "immediate parole for a period of not less than five years." Defendant objected to that part of the verdict recommending parole and the jury was instructed by the trial judge to read Instruction No. 1 as to sentencing and directed the jury back to the jury room to continue its deliberations. At 12:40 a. m. the jury was again brought back to the courtroom and their previous verdict was accepted with the trial court treating the recommendation for probation as surplusage. *State v. Keck*, 389 S.W.2d 816, 819[8] (Mo.1965). However, when the jury was polled one of the jurors stated that the verdict was not his and the jury was again returned to the jury room to resume its deliberations. Ultimately, at 1:20 a. m. the returned its verdict finding the defendant guilty of statutory rape and

assessing his punishment at two years in the custody of the Missouri Department of Corrections but continued its "recommendation for immediate parole in custody of the Missouri Department of Corrections." The trial court, after polling the jury, received this verdict over the defendant's objection.

Subsequent to the jury verdict and the filing of a motion for new trial by trial counsel, present counsel entered his appearance and filed a Supplemental Motion for New Trial. The bases for this Supplemental Motion for New Trial were two-fold, as shall hereinafter be set forth.

After the jury verdict the defendant submitted himself to polygraph tests on five separate occasions by two different operators, and it was the opinion of both that defendant "was answering the questions truthfully when he denied committing the act." The "act" referred to was this rape. Post-verdict investigation conducted by a detective on one of the municipal police forces of St. Louis County, by and with the cooperation of the prosecutor's office, for the purpose of developing evidence which might shed some light on the case followed. The detective, who was familiar with the details of both an attempted rape and a completed rape to which one "S. . . . F. . . . " had pled guilty in St. Louis County and in St. Charles County, respectively, concluded that the similarity of the crimes was significant. He was also aware of the fact that "S. . . . F. . . . " lived within 8 to 10 blocks of the prosecuting witness' home and fit the general description of her attacker. Accompanied by the assistant prosecuting attorney who tried this case and two other detectives, this detective travelled to the State Penitentiary in Jefferson City, Missouri, where he interviewed "S. . . . F. . . . "[1] in April, 1973. In the course of

1. The detective also testified at the hearing on the motions for new trial that he had previously interviewed "S. . . . F. . . . " in the St. Charles jail on October 24, 25 and 26, 1971, at which time he had light hippie-type hair with a bushy mustache, that he looked to be between 18 and 25 years of age, 5′6″

to 5′10″ in height, weighing 170 pounds, and medium build and complexion. On cross-examination the detective estimated that "S. . . . F. . . . " was 6′ to 6′1″ tall. This previous interview with "S. . . . F. . . . " was relative to an attempted rape in St. Louis County to which "S. . . . F. . . . "

this interview an effort was made to determine whether "S.... F...." had been involved in any other crimes in the St. Louis area but he would not make any statement because he felt "he had got a raw deal from St. Charles County." He was shown photographs of this defendant and when the conversation ended "he stood up and he took his finger and he pointed, he hit it several times on Mr. Graham's mug shot, and he says, 'One thing I can tell you is he is getting railroaded.'"

Evidence of the post-trial investigation was presented to the trial court at a hearing on the motions for new trial. The polygraph operators did not testify, but it was stipulated between the parties that had they testified at the hearing they would testify that "it is their opinion that the defendant told the truth when he denied raping D.... L...." The detective who conducted the interview of "S.... F...." did appear and testified to the results of his investigation set out supra.

Defendant's motions were overruled, allocution granted and the defendant was sentenced to a term of two years in the custody of the Missouri Department of Corrections and placed on probation for a period of five years.

Defendant, in this court, candidly admits that he does not contend that the trial court erred in denying his Supplemental Motion for New Trial on the basis of the evidence offered at the hearing thereon. He does, however, argue that the evidence offered in support of the motion ought to be considered by this court in determining whether the defendant is the victim of manifest injustice or miscarriage of justice.

The thrust of his argument in this respect is the same as he has previously made concerning the weakness of the State's case and the infusion into the minds of the jurors by means of the questions to which objections were interposed his "conscious-

ness of guilt" by reason of the fact he exercised rights constitutionally guaranteed to him so that the doubt in the jurors' minds as to his guilt were assuaged by their recommendation that he be immediately paroled. The jury's verdict alone, he contends, is inconsistent with a crime of this nature, where a 13 year old virgin is introduced into not only sexual intercourse alone but also sodomy, and, if found guilty beyond a reasonable doubt by a jury, a two year sentence and recommendation for parole is not consistent with the evidence to support a finding of guilt. He infers that anyone guilty of this crime should be punished more severely. These matters, he argues, together with the polygraph results and the suspicions of the detective warrant a reversal of this conviction so as to avoid a manifest injustice or a miscarriage of justice.

A conviction of rape may be sustained on the uncorroborated evidence of the prosecutrix alone where the evidence was not contradictory in nature or unbelievable. *State v. Gray,* 423 S.W.2d 776, 781[5] (Mo.1968); *State v. Davis,* 497 S.W.2d 204, 207[2] (Mo.App.1973). Furthermore, the testimony of a single witness, if believed by the jury beyond a reasonable doubt, is sufficient to establish identity of a defendant in a criminal prosecution since the credibility of the witnesses and the weight of the evidence is for the jury. *State v. Tucker,* 451 S.W.2d 91, 95[5] (Mo.1970); *State v. Williams,* 376 S.W.2d 133, 136[9] (Mo.1964). A reviewing court does not undertake to determine the credibility of witnesses or weigh evidence in a criminal case. *State v. Williams,* supra, l.c. 136[11].

Defendant overlooks that the prosecuting witness testified that she could see the features of her attacker from the light which was behind him, and that when he turned to the side she could see his face, that when she was at the County Police headquarters in the early morning hours following the

subsequently pleaded guilty and was in the custody of the Missouri Department of Cor-

rections when the interview relative to this case took place.

rape she looked at 150 to 220 mug shots over a period of a couple of hours but she was unable to find the rapist among those, although some of them looked similar to the man who had assaulted her. Several days thereafter she did return to County Police headquarters and again viewed some mug shots (this time after the defendant had been arrested and photographed) and on this occasion she saw a picture of the man who attacked her although she had not seen him again in the intervening period. She identified the man in the photo as the one who attacked her. Sometime between a few weeks and a couple of months after the assault she caught a profile view of a man who was walking past while she was in the Catanzaro house from a distance of approximately 15 feet. Then again a couple of weeks later she saw the defendant at the Courtwright's house while she was watering the lawn at her home. He came there in a van, went in the house, came out again a little later and left. In addition to identifying the defendant by voice on September 10, 1971, she visually identified him in the line-up of that date as her assailant. At trial she again identified the defendant as the rapist. She was thoroughly cross-examined on the issue of identification by the counsel for defendant but remained unshaken in her identification of the defendant as the man who raped her.

■ While we do not conclude that the evidence proffered by the defendant in support of his Supplemental Motion for New Trial constitutes, in the legal sense, "newly discovered evidence," it is often said that in a criminal prosecution the "newly discovered" evidence to authorize a trial court to grant a new trial on that grounds alone must be of such a character as, on being considered with the rest of the testimony, is likely to lead to an acquittal on a new trial as by raising a reasonable doubt as to the guilt of the defendant. 58 Am.Jur.2d, New Trial § 172 (1971). A new trial is not automatically required whenever evidence disclosed after trial may be useful to the defendant but not likely to change the ver-

dict. *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *State v. Flauaus,* 515 S.W.2d 873, 880[16] (Mo.App.1974).

■ The courts of this state have not accepted polygraph evidence in the quest for truth in the trial of either civil or criminal cases. *State v. Weindorf,* 361 S.W.2d 806, 811[17] (Mo.1962); *State v. Bibee,* 496 S.W.2d 305, 315–316[21] (Mo.App.1973). In *McCroskey v. United States,* 339 F.2d 895, 897[4] (8th Cir. 1965) the results of a polygraph test given a defendant after his conviction did not qualify as evidence newly discovered since the trial of the defendant moving for new trial on grounds of newly discovered evidence. The polygraph evidence in this case would not be admissible in a new trial of the instant case and cannot therefore be the basis for the granting of same.

■ Nor are the suspicions of the results of the investigations at the Penitentiary evidence which would be admissible at trial were a new trial granted.

■ We would be less than candid if we did not recognize that this case is somewhat troublesome, but that fact alone does not justify the setting aside of this conviction. This defendant, like any other, is guaranteed a fair trial but not a perfect one. *Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972). This we conclude the trial judge afforded him despite some effort by the prosecutor to induce into the trial inadmissible evidence which, if not excluded by the ruling of the trial court and his instruction to the jury to disregard the evidence which came in prior to the objection, might have made it necessary for this court to reverse and remand. However, in view of the trial judge's prompt rulings that has been obviated.

We have reviewed the sufficiency of the Information in Lieu of Indictment on which this cause proceeded to trial, the verdict,

judgment and sentence as we are required by Rule 28.02 and find them to be in order.

The judgment of the trial court is affirmed.

SMITH, C. J., and STEWART, J., concur.